to the second case of the day, the United States v. Campuzano-Benitez and others. Appeal numbers 18-12-36 and 18-13-15. Ms. Wood? Thank you, your honors. May it please the court. The district court did not rely on credible evidence in determining drug quantity attributable to the appellants below. What the court relied on instead was a cooperating defendant who the court explicitly declined to find credible, assertions in plea agreements that were inconsistent with both the court's ultimate findings and the government's position at sentencing in this case, and misapprehension of facts in the record. What the court never addressed was the government's ever-evolving theory of this case. And these factors, taken as a whole, render the district court's finding clearly erroneous, even in light of the deferential standard. Can you explain why Perdomo had a motive to lie about 5 kilograms versus 1 kilogram? Wouldn't it have been in his best interest to stick to 1 kilogram all along? I mean, what did he obtain in exchange for testifying about a larger amount? Is it simply an argument that he knew or he thought the government wanted him to lie? I mean, he would have been valuable to the government's case, even if he stuck to the single-kilogram transaction. Judge, his motive was to agree with the government's theory of the case to continue to be, in their opinion, a potentially helpful witness. And their theory of the case began with their belief that this sale was for 10 kilograms of cocaine. When the lab tests came back, that theory changed to, well, the parties thought they were going to be selling 10 kilograms of cocaine, even though 4 kilograms of cocaine were actually heroin. And as we state in our brief, that theory is just, in our opinion, absurd. And then finally, when we raise why that theory is absurd in our pleadings, that theory changed to 5 kilograms of cocaine. But ultimately, I don't think that Perdomo's motive to lie is that germane, because the district court explicitly declined to find him credible or incredible. And based on that, it would be clearly erroneous for the court to rely on his testimony in finding that the appellants were accountable for 5 kilograms of cocaine. Well, I mean, if we set aside Perdomo for a moment, it appears that both the sellers and the ultimate buyers thought the deal was for 5 kilograms of cocaine. Given that the appellants were the middlemen through whom this information had to pass, why is it reasonable to infer that they were privy to the quantity? Judge, I would agree with you that they were privy to what the ultimate quantity was,  and what the sellers, the Nunez-Galeanas, actually admitted in their plea agreement was that the sale was for 10 kilograms of cocaine, not for 5. And that assertion, that claim that the sale was for 10, does not corroborate this later claim that, well, it was actually for 5. That claim, their claim in their plea agreements is based on this theory that, well, what they thought they had was cocaine, and they were intending to sell that to the buyers. That is nonsense, because as we lay out below, those kilos are stored in separate cabinets, they're wrapped in different colored material, and the drugs themselves are different colors. The Nunez-Galeanas, whatever the deal was for, was immaterial to their motivations to accept responsibility for that amount of drugs, because they were going to be on the hook for them for the 10 kilos of whatever they were, no matter what, under 1B1.3. And it was in their interest to accept this theory that, well, they believed it was cocaine, because that led to a lower guideline offense level. Ms. Wood, is the defendant's theory here that they were willing to broker a 1 kilo deal, but were unwilling to broker a 5 kilo deal? The theory here is that the deal was always for 1 kilo of cocaine, and they did not have reason to believe that the amount of drugs at the center of the deal would rise above 1 kilo of cocaine. Did they testify at the sentencing hearing? They did not. But I think that, given the unique circumstances of this case, where all of these defendants came together for the very first time to make this drug deal happen, I think Your Honor's point would be germane in a case where there were repeated transactions, and you could infer a willingness to deal in larger quantities, even if the ultimate sale was 1 kilogram of cocaine. If this had been a repeated conduct on the part of the defendants. These defendants were supposed to get a flat fee regardless of the amount? That's correct. How much was the fee for each of them? I don't think that there is any... I believe that there is a claim that it may have been $1,000, but I don't think there's any hard evidence of what that fee was in the record. Go ahead. I understand that you believe that the court wrongly relied on Pradilla's testimony after refusing to find it credible. But my reading is that the court in fact said it had not found the testimony credible or incredible, but reviewed it carefully, given the source, and credited only the parts that were corroborated. I agree that that's what the court said, Your Honor. I think initially the statement that it's neither credible nor incredible, I'm not sure what lies in between those two things, but whatever it is, I don't think is reliable enough to credit it sentencing. Secondly, what... That's where a court will believe part of what a witness states, but not another part. I mean, it isn't as if once a liar, always a liar. I agree with that, but here what the court said was corroborated not... What the court said was corroborated was the recorded calls where the drug quantity was fluctuating. That does not corroborate Perdomo's claim that the appellants knew that the drug quantity was fluctuating. Those recorded calls were between Perdomo and the cooperating witnesses in this case, and there's no indication that the appellants were privy to what was said in those calls. And to the point... But it is corroboration, is it not, that the deal was for five kilograms? I do not believe it's adequate corroboration, because Perdomo admitted lying to the cooperating witnesses during those... to the cooperating witnesses about the availability of different quantities of cocaine during those calls. But it's evidence that even if it was fluid, even if it was in flux, I mean, there was a conspiracy to sell the cocaine, and it's evidence that it was a fluid amount. Maybe it ended up at five kilos. It's evidence... It's a fluid amount that they had agreed to, and so it can be attributed to them. I don't believe it can be attributed to the appellants. It can certainly be attributed to Perdomo, but there's no evidence corroborating the argument that appellants knew about this fluctuating amount. I see I'm under my rebuttal time, and I'd like to reserve the rest. Thank you, Ms. Wood. Mr. Graspis? Thank you, Your Honors. If I can just follow up on that for a moment. I would submit to the Court that it's not corroboration as to relevant conduct, and I think we need to look at those concepts separately. For it to be relevant conduct, it would require that it would be within the scope of the criminal activity that they all agreed to. This was for a one-time, one-kilo deal. Therefore, it's not corroboration from our point of view under Salem. Furthermore, it's not part of the agreed criminal activity, which would also have to be under that bipartite test under Salem, and it wasn't foreseeable because our clients never agreed to go beyond or they never knew that it was ever going to go beyond one kilogram. And therefore, Your Honor, Judge Rava, to the extent that we're referring to it as corroboration of what our clients knew, I would say that it was not. I'd like to touch on, if I can, our issue with the way the evidentiary hearing was taken. We're not here to ask you to change the rule about confrontation clause application in a sentencing. However, we're asking you to recognize that an evidentiary hearing is a distinct and separate part of the larger sentencing hearing. Although it's part of that rubric, it has the safeguards and the qualities of a trial. And therefore, in a situation like this, where we have the witness in court testifying with the safeguards of under the federal rules of evidence he's sworn in, the order of the evidence is taken just as it were the trial, the form of the questions are required to conform to the rules. There is latitude in an evidentiary hearing that may not apply to a trial. But nevertheless, the confrontation clause protection ought to still apply because to stop the hearing, mid-hearing, because the cooperating witness wants to confer with his attorney. Before the, we have our opportunity for process abidance. This was after direct? This is after direct. And before process starts. No question pending. No question pending. He's still on the stand. We object. We're told on the spot, do you have any authority to back you up? I've never come to an evidentiary hearing or any hearing thinking that I'm going to be asked for authority to contradict why a witness on the stand needs to not have his lawyer allow him. Have you had any experience with witnesses who need to consult with counsel about privilege issues? Or in this case, you've got a cooperating witness who's got to make sure he doesn't blow his own deal with the government? Judge, I have been the attorney for cooperating witnesses. I am not allowed to, again, in a trial context, I am not allowed to have any contact with them, nor have they asked me to intervene. I would think they'd be entitled to talk to you. Well, Judge, if you, I would think that in the middle of examination they would not be. I would think that the With a question pending, it's different. Think about, I mean, witnesses in depositions talk to their lawyers all the time. Well, then, Judge, well, I don't think that's the situation that we have here. We've already had a direct examination. Now they can anticipate what's going to come on cross. I think the Supreme Court, albeit an ineffective assistance case, which we cite twice in both our briefs, the name of the case is Perry v. Leakes. I think they said it best when they said cross-examination often depends for its effectiveness on the ability of counsel to punch holes in a witness's testimony at just the right time in just the right way, permitting a witness, including a criminal defendant, to consult with counsel after direct examination but before cross-examination grants the witness an opportunity to regroup and regain a poise and sense of strategy that the unaided witness would not possess. And I stress this. They also said it's simply an empirical predicate to our system of adversary rather than inquisitorial justice that cross-examination of a witness who is uncounseled between direct examination and cross-examination is more likely to lead to the discovery of truth than is cross-examination of a witness who is given time to pause and consult with his attorney. And, again, that is in a trial context. But those are poor principles that I think apply to the Confrontation Clause protection that ought to be afforded to someone who, in an evidentiary setting, although under the rubric of a sentencing, in an evidentiary setting, is distinct. And I see my time is passing. So direct examination ends at 5 o'clock, recess for the night. Does that violate the defendant's rights? Usually the judge will say you're not allowed to talk to your... What judges say that? Is that here in the Northern District? No, Judge. It's been my state court experience that if there's someone on the stand, they're still on the stand, they're usually admonished that unless it's your client, they can't talk. Well, a lawyer can talk. Usually a witness can talk to his lawyer, right? But this is different. He's not the client. He's a witness. He's a client of his lawyer. He's not the defendant in this particular proceeding. But, okay, thank you very much. I reserve my time, Judge. Thank you. Okay, Ms. Jackson for the government. May it please the Court. My name is Shai Jackson, and I represent the United States. This Court should affirm the defendant's sentences because the factual determinations made by the sentencing court were based on reliable evidence. Do you know that all of the cases that were cited on page 49 of your brief regarding the standards for minor role reductions were issued before the guidelines commentary change? Are there any cases that came after the change that support the government's position? And no one talks about the money involved, but it seems that the $1,000 the defendants were collecting is miniscule compared to the value of the drugs being transacted. Wouldn't that suggest that they played a minor role? Your Honor, the government did cite one case in its brief regarding the mitigating role issue that was subsequent to the 2015 amendment. That was United States v. Orlando, which is a 2016 case. And in that case, which is very similar to the situation that we have here,  was not limited to just making introductions, but instead actively participated as a middleman. And he did that by relaying information, as the defendants did here, by attending meetings, as Defendant Campuzano-Benitez did on the eve of the drug transaction, as well as being involved in the conspiracy from inception to the conclusion of the conspiracy, as both defendants admitted to in this case. With respect to the money involved, while the flat fee is smaller than the ultimate drug sale, which I don't want to say, I don't think the record reflects that the fee was $1,000. I don't think there is information in the record regarding how much the defendants were going to be paid for brokering this deal. The $1,000, I think, is the amount that Defendant Campuzano-Benitez agreed to pay per domo for participating in the deal. While that fee is less, I don't think it reflects or diminishes the fact that the defendants actively participated in this conspiracy, not in a minor way, but in a substantial way, which is what the District Court found. Moving back to the drug quantity issue, at sentencing, the evidence before the District Court established that in the four days leading up to the drug transaction, the defendants funneled information about the transaction between the purchasers and the suppliers. And because the purchasers and suppliers did not know each other, they could only communicate through the defendants. During those four days, as reflected in the recorded conversations, the drug amounts were in flux and the parties were in regular communication regarding that drug quantity. Between June 13th and June 17th, Perdomo spoke with Defendant Campuzano-Benitez multiple times about the sale quantity and also about the price per kilogram. Specifically, Perdomo testified at the evidentiary hearing that prior to his June 15th telephone conversation with a cooperating witness, that he had spoken with Defendant Campuzano-Benitez, who had confirmed that five kilograms of cocaine were available for sale. In addition, as Perdomo testified and as was reported in Defendant Campuzano-Benitez's PSR, Perdomo met with Defendant Campuzano-Benitez on the eve of the sale, on June 16th, where they discussed that the deal would be for five kilograms of cocaine. The very next morning, Perdomo had a recorded telephone call with the cooperating witness and repeatedly told the cooperating witness that the deal was for five kilograms of cocaine. Also before the district court was the fact that the individuals on either side of the transaction, Perdomo on the supplier side and the Nunez-Galeano brothers on the supplier side, knew and admitted that the deal was for at least five kilograms of cocaine. And both of those parties were on either side of the defendant and communicated through the defendants. With respect to the Confrontation Clause issue, the district court did not abuse its discretion in allowing Perdomo to briefly confer with his own lawyer prior to cross-examination beginning at a sentencing hearing. As is recognized by the defendants, the Supreme Court has held that the Confrontation Clause does not apply at sentencing. Instead, the key at sentencing is reliability. Here, the consultation occurred following the close of direct examination, but before cross-examination began, it was brief, and defense counsel thereafter had the opportunity to vigorously cross-examine Perdomo, file post-hearing briefs, and also argue at two sentencing hearings. Importantly, the defendants have not identified any prejudice resulting from the brief consultation. If there are no further questions from the court, I will ask the court to affirm the defendant's sentences. You know, I do have one question. Yes, Your Honor. I don't know that it's a question, but the government theory that the sellers thought that the heroin was cocaine is very troubling to me. I know that I'm correct if I say that heroin is roughly three times the cost of cocaine in the wholesale context. The separate hiding places, the separate packaging, the different appearance of the drugs all make this theory very unlikely. I have to imagine from other recent cases that the wholesale value of these drugs was somewhere between half a million and a million dollars. That would be the kind of error that would get the sellers killed by their suppliers. It's very troubling to me that this was the government's theory at any stage of the proceedings. Do you see where I am? Yes, Your Honor. I understand your concern. I think the issue is here. Well, first of all, the Nunez-Galeano brothers admitted that they mistakenly believed that all the drugs in their possession was cocaine and not heroin. And notwithstanding that, the difference is the same here. The result is the same because under the guidelines, whether it's five or ten kilos, what the deal was ultimately for, the sentencing range is the same. The offense level is the same. Where was the additional cocaine hidden in the house? The transaction was taking place in a bedroom in the apartment. And in a closet in that bedroom, there were cabinets. And in those cabinets, in one cabinet, there were the five additional kilograms of cocaine. And in the other cabinet, there were the four kilograms of heroin. No secret compartments? They were hidden in a cabinet, and there was like a fake wall. Exactly, Your Honor. Okay. Thank you. Thank you, Your Honors. Brief rebuttal, Ms. Wood. How much time? Okay. Make it a minute. Thank you, Judge. Briefly touching on this admitted, the fact that the Nunez-Galleones admitted that they mistakenly believed the heroin was cocaine, that is just simply not credible, given the photographic evidence. And, of course, as I previously stated, and as I've stated below, it, of course, was in their interest to admit or claim that they mistakenly believed that this was cocaine because it was treated less seriously under the guidelines. Regarding the minor role application, the fact that the appellants have admitted that they were involved from June 13th to June 17th, which was the time frame of the conspiracy, is not relevant to that inquiry because every single defendant admitted that they were involved for that length of time. So that does not somehow separate the defendants or make them more culpable than any of the other defendants or the average participant in the conspiracy. Unless there are further questions. Thank you. Thank you. Mr. Grass, what's your time? It expired at one minute. Judge, with respect to that Sixth Amendment issue, the issue isn't, as far as we're concerned, the opportunity or the extent to which to cross-examine, but the meaningful cross-examination and the effective cross-examination, which we were denied because that cross-examination was then framed by the mid-game huddle that they were allowed to have in between examinations. So, therefore, I don't believe measuring it by how much we were able to cross-examination is really the issue here. Secondly, Judge, in response to the flux argument, I just want the Court to consider that the government waited two years after this case began with the defendant's arrest until just minutes before the evidentiary hearing was held of Mr. Perdomo to disclose that contrary to its long-held position of 10 kilograms, which he affirmed during the first proffer two years prior to his evidentiary hearing that it was 10 kilos, to finally tell us that, oh, no, after his second proffer, on the day before and the day of his evidentiary hearing, it was 5 kilos. So even if it had been in flux before their arrest, it certainly was in flux after their arrest. They knew about it, or they should have known about it, because their own cooperator was the one who was telling them what the case was about. Thank you. Thanks to all counsel. The case is taken under advisement.